**MATSON NAV. CO. v. WAR DAMAGE CORPORATION.**

**No. 24575.**

District Court, N. D. California, S. D.

Nov. 17, 1947.

Lyman Henry, Kent A. Sawyer, and Hall, Henry & Oliver, all of San Francisco, Cal., for plaintiff.

Allan E. Charles, Edward D. Ransom, and Lillick, Geary, Olson, Adams & Charles, all of San Francisco, Cal. for defendant.

GOODMAN, District Judge.

While en route from the Hawaiian Islands to Continental United States on or about December 11, 1941, plaintiff Matson Navigation Company's steamship Lahaina was attacked and sunk by a Japanese submarine. By this suit, filed March 22, 1945, plaintiff seeks to recover from the defendant War Damage Corporation the value of the steamship, which, the parties agree, is the sum of $615,000. Right of recovery is claimed under an amendment to the Reconstruction Finance Corporation Act which on March 27, 1942, somewhat over three months after commencement of hostilities between the United States and Japan, became law. 15 U.S.C.A. § 606b—2, 56 Stat. 175, § 5g. By the terms of this amendatory statute, defendant was authorized to provide, not later than July 1, 1942, insurance protection against loss or damage to property as a result of enemy attack, subject to such general exceptions as defendant, with the approval of the Secretary of Commerce might deem advisable, upon the payment of premiums or charges which defendant, also with the approval of the Secretary of Commerce, might fix. So far as here pertinent, the statute also provided that such insurance protection should apply only to property situated in the United States, the Philippine Islands, the Canal Zone, territories and possessions of the United States and such other places as the President might determine to be under the dominion or control of the United States and also to such "property in transit" between any of the localities designated.

Recognizing that protection should be afforded to those whose property might be lost or damaged in the interval of time between the declaration of war against Japan and the date when the defendant would become an operating and functioning entity, Congress further provided in this statute that losses occurring during such interim should be compensated by the defendant without any contract of insurance, payment of premium or other charge, in the same manner as if there were insurance contract coverage. The full text of § 606b—2 is set out in an appendix hereto.

Three years later, to-wit, on December 29, 1944, the plaintiff presented its claim to the defendant for the value of the Lahaina. On January 19, 1945, the claim was denied upon the ground that the statutory provisions regarding *property in transit* were not interpreted by defendant as intended to have application to *vessels in transit*.

The primary question squarely posed in this litigation therefore is: whether the act of the defendant corporation in excepting vessels in transit from insurance coverage was a proper interpretation of the statute; or put in another way, was the vessel Lahaina the kind or type of "property in transit" entitled to protection under the terms of the statute during the interval between the declaration of hostilities between the United States and Japan and the effective date of the commencement of functioning by the defendant corporation.[1]

No such question has been heretofore decided by the courts of the United States.

■ The testimony of so-called experts in the insurance field was produced at the trial concerning the meaning of the words "property in transit". The Court is of the opinion that this testimony is of little, if any, value in determining the extent and meaning of the coverage which Congress provided for in this statute. The meaning of the statutory language must be resolved

against the background of the history of and the circumstances impelling the legislation as well as from what may be gleaned from the Congressional proceedings.[2] These accepted guides to statutory interpretation reveal the following:

After Pearl Harbor, fear of enemy bombing along the Coasts of Continental United States was widespread. Owners of property there situated found themselves uninsured against loss due to enemy attack and unable to provide themselves with insurance of that type through private insurance companies. This tended to undermine morale and affect the maximum production essential to successful warfare.[3] To allay the fears of such persons, and believing it in the public interest to act quickly as well as within his power so to do, Federal Loan Administrator Jesse H. Jones publicly announced by press release dated December 13, 1941, future governmental extension (through a corporate instrumentality of the Reconstruction Finance Corporation, finally denominated "War Damage Corporation") of reasonable financial protection to owners of property in the Continental United States against enemy attack, without charge but with certain exceptions and reservations. By a later press release on December 22, 1941, Mr. Jones publicly announced the extension of similar protection to owners of property in Alaska, Hawaii, Philippine Islands, Puerto Rico and the Virgin Islands.

Soon thereafter Senate Bill 2198, sponsored by Mr. Jones, was introduced in Congress. This bill aimed to put the Legislative stamp of approval upon and to provide the means for a government program of reasonable war risk protection to those owners of property in the United States and its territories and possessions, who were unable to find that protection through private sources.

Hearings on the proposed legislation were first held in January 1942 before the

---

[1] If defendant's interpretation of the statute was correct, it obviously acted properly in denying plaintiff's claim and the issue as to the scope of its statutory power to make general exceptions from coverage of certain property becomes irrelevant.

[2] Several special defenses have been urged by defendant, but it is clear to the court that the issue presented can and therefore should be squarely determined from the meaning of the legislative language itself.

[3] Senate Report No. 1012 accompanying S. 2198, p. 2.

Senate Committee on Banking and Currency. The foregoing reasons for and general objectives of the legislation were there explained by Mr. Jones.[4] The proposed legislation, as so stated by him, did not contemplate provision for maritime insurance, and was prospective in operation. At these hearings also appeared the Honorables Samuel W. King and Anthony H. Dimond, Delegates respectively from Hawaii and Alaska. Each urged amendment of the bill to extend war risk protection to *goods* in transit between the United States and the Territory each represented. Their proposal was motivated by the almost complete dependency of these territories on water-borne commerce with the United States. The Delegates explained that following Pearl Harbor, commercial rates on cargo war risk insurance had increased prohibitively and to the extent of seriously threatening the economy of the Territories unless relief were afforded and that since such insurance could not be obtained from the Maritime Commission, such property should receive the benefits of the legislation under consideration.[5]

The Hawaiian Delegate further proposed to make the bill retroactive to December 7, 1941, to cover the Pearl Harbor losses—these losses having occurred before protection was for the first time promised by the press release of December 13, 1941.

After the Territorial Delegates had presented their case, Senator Clark of Idaho proposed an amendment to extend protection to property situated in *"or in transit between"* the United States and the described Territories and possessions.[6] The discussion which followed is persuasive that all participants in the same were agreed that while such in-transit cargo needed and should have the protection sought by the Hawaiian and Alaskan Delegates, nevertheless the proposed bill should not extend its coverage to any maritime war risks if insurance therefor was obtainable through the Maritime Commission or otherwise.[7]

Following assurance by Mr. Jones that in the administration of the proposed law, marine protection thereunder would be limited to cases where the Maritime Commission was powerless to act, the substance of the Clark "property in transit" amendment was adopted.[8] The bill, however, as reported by the Senate Committee (S.Report 1012), was not retroactively effective. It contemplated a plan of insurance covering only future risks compensable through the War Damage Corporation, and based on contract and premium charges as to coverages exceeding a specified minimum amount.

On February 3, 1942, after discussion and debate, the bill with Senate Committee amendments was passed in the Senate. 88 Cong.Rec. 986-999. During the discussion preceding its passage, Senator Maloney, speaking on behalf of Mr. Wagner, Senate sponsor of the bill, pointed out that the coverage originally contemplated thereby had been extended by the "property in transit" clause, not only to "the cargo of the vessel itself" but also to "the personal effects of people traveling on such vessels."[9] Coverage of vessels themselves however, was nowhere indicated in these discussions.

On February 2, 1942, Senate Bill 2198 as reported out of the Senate Committee came

---

[4] Senate Committee Hearings, p. 6, 7, 9, 10, 11.

[5] Senate Committee Hearings, p. 25, 27, 28, 29, 31, 32, 33.

As to the availability of marine war risk insurance under the then provisions of the Merchant Marine Act 1936, as amended 1940, 54 Stat. 689, 46 U.S.C.A. § 1128 et seq., the situation, as represented, was this: The Maritime Commission by such Act was empowered to issue such insurance only on American vessels and their cargoes. Since shippers of cargo could not determine in advance the type of vessel in which the same would be transported, the practical re-

sult was that while insurance on American hulls could be and was made available by the Maritime Commission under the Act, cargoes, except in a very limited way, were unprotected. Senate Committee Hearings, p. 97, 99; See also House Committee Hearings on S. 2198, p. 41, 42.

[6] Senate Committee Hearings, p. 73, 74.

[7] Senate Committee Hearings, p. 97, 98, 99.

[8] Senate Committee Hearings, p. 99, 100.

[9] 88 Cong.Rec. pp. 989, 990.

before the House Committee on Banking and Currency. Mr. Jones again stated the general reasons for and objectives of the bill, explaining that under Senate Committee Amendments, goods in transit would be covered only when insurance could not be obtained from the Maritime Commission, but that in his opinion the vessels themselves would not be covered.[10]

There was general accord with the view as expressed in the Senate Committee that Marine War Risk insurance should not be an objective of this bill, and, further that it should more specifically so state.[11] The following House Committee Amendment was therefore agreed to: "That such protection shall not be extended to property in transit upon which the United States Maritime Commission is authorized to provide marine war risk insurance."[12]

The House Committee was, however, also of the opinion that since neither the Pearl Harbor losses of December 7, 1941, nor the in-transit cargo losses suffered before the public announcement of coverage of December 13, 1941, were within the purview of that announced coverage, such losses, if not otherwise compensable, should as well receive the benefits of the proposed bill.[13] It was therefore agreed that coverage should be extended not only to the defined losses which *may* result from enemy attack, but also to those which "may have heretofore resulted,"[14] so that all persons without opportunity of having obtained war risk insurance on such past losses would be protected until a government created insurance plan was worked out.[15] To fully accomplish this purpose, a further committee amendment was adopted to thus extend coverage of the bill without premium

charge for the period from December 7, 1941, to a date fixed by the Federal Loan Administrator not later, however, than July 1, 1942[16] (the bill having already been amended to provide for future coverage on a contract and premium paying basis). Chairman Steagall explained during Committee discussion that the bill with these amendments would cover goods in transit lost by enemy action from and after December 7, 1941, subject, however, to the proviso limiting such coverage to property in transit upon which the United States Maritime Commission was not authorized to provide similar coverage.[17] As so amended, Senate Bill 2198 was reported to the House on February 6, 1942[18] (88 Cong.Rec. 1154), and was passed on March 2, 1942 (88 Cong.Rec.1921).

During the discussion preceding the bill's passage in the House[19] inquiry was made whether the government was "taking a direct loss in all of the torpedoings of cargoes and oil tankers and things like that * *." Mr. Bland, referring to H.R.6554 to amend the Merchant Marine Act of 1940, replied that "things like that are being taken care of under the war-insurance bill, which was extended today. I have just put into the basket a report on the amendment to that bill, which covered every phase of the marine liability and risk." 88 Cong.Rec. 1903.

After Senate disagreement with the House Amendments, the bill went to a Committee of Conference. The Conference Report (House Report No. 1907) retained the House Amendments. The only conference change here significant was the House Amendment, revised in Conference to read as follows: "Provided, That such

---

[10] House Committee Hearings, p. 18, 21, 22.

[11] House Committee Hearings, pp. 44–47.

[12] House Committee Hearings, p. 88, 93.

It is apparent from the Committee discussions that what prompted this specificity of language was a lack of certainty on the members' part with respect to the exact scope of the Merchant Marine Act, and a desire not to duplicate any of the functions there delegated to the United States Maritime Commission.

[13] House Committee Hearings, pp. 80, 81.

[14] House Committee Hearings, p. 82.

[15] House Committee Hearings, p. 84.

[16] House Committee Hearings, p. 94.

[17] House Committee Hearings, p. 93.

[18] House Report No. 1752.

On the same day, H.R. 6554 sponsored by Mr. Bland, was introduced. This bill was designed to enlarge the scope of the Merchant Marine Act of 1940, and would permit of the issuance of insurance by the Maritime Commission on substantially every type of Marine war risk.

[19] 88 Cong.Rec. 1901–1921.

protection shall not be applicable after the date determined by the Secretary of Commerce under this subsection to property in transit upon which the United States Maritime Commission is authorized to provide marine war risk insurance." [20]

The Conference Report did not explain the reason for this change nor was the same later discussed in either Senate or House.[21] In the House discussion of the Report, just prior to the bill's passage, Mr. Steagall did answer affirmatively the question whether the "sinkings" taking place would be covered during the free protection period. 88 Cong.Rec. 2699. Coverage of "sinkings" during that period was again later mentioned with reference to the advisability, in view of their increased number, of covering losses arising from such sinkings without premium requirements. 88 Cong.Rec. 2701. Certain statements on the floor of Congress might be pointed out as indicative of a difference in understanding on the part of individual Congressional members as to the true meaning ascribable to the phrase "property in transit" or the purpose of its insertion in the bill by Senate Committee Amendment.[22]

■■ But nowhere throughout the proceedings in Congress or in Committee is there any statement or discussion indicating a conscious Congressional intent to extend the scope of the phrase beyond that originally contemplated.

The entire history of the legislation, viewed in the background of its origin and objectives, convincingly exhibits a general Congressional intent to extend reasonable free government protection against loss from enemy attack, to property in the United States, its territories and possessions, and to goods undergoing transportation between these points—until a system of paid insurance contemplated thereby had been put in operation; and to thereafter extend similar protection under contract of insurance with premium payment, except as to

goods in transit insurable by the United States Maritime Commission. Coverage at any time by the War Damage Corporation, of the vehicle of maritime transportation—the vessel itself—was never within the contemplation of Congress.

The gist of all discussions, whether in Committee or on the floor of Congress, from the time of Mr. Jones' first public announcement to the date of passage of the Act, concerned the intent to protect cargoes in transit which were not insurable by the Maritime Commission and insurable otherwise only through private sources at prohibitive costs.

It is true, as pointed out by plaintiff, that there was reference to "ships" and to "sinkings" on the floor of Congress during discussions preceding passage of the Act. But such a method of ascertaining intent is specious. An isolated question and answer become misleading if not fairly set into the whole picture. Thus in the House discussions, asked whether *cargoes and ships* on the high seas were to be covered, the response made *consecutively* by each of the *two different House sponsors* of *both* the Act here involved and the amendments to enlarge the scope of the Merchant Marine Act was in the affirmative. 88 Cong.Rec. 1903.

Congress was engaged between January and April 1942 with a comprehensive and overall plan of insurance protecting property on land and sea. This Act and Amendments to the Merchant Marine Act were the instrumentalities discussed to accomplish this objective. Each was intended to take care of different risks. Hence it is that discussions in Congress must be related severally to the proposed statutes.

Plaintiff entirely misconceives the function of the defendant as intended by Congress. Defendant's function as originally conceived was to insure residents of the Continental United States against damage to their property from bombing. Hundreds

---

[20] The bill as reported by the Conference Committee, became law on March 27, 1942. 56 Stat. 174.

[21] The most reasonable explanation for this change would seem to be that the legislators felt that by July 1, 1942, if not earlier, the Merchant Marine Act

would have been so effectively amended to cover all maritime risks as to permit of the desired withdrawal of the War Damage Corporation from any field of maritime activity.

[22] See statements on p. 28 of plaintiff's Opening Brief.

of thousands of policies were thereafter issued to residents of Continental United States. The corporation still has in its treasury over $200,000,000 collected in premiums in performing this service. The defendant corporation was never purposed to have anything to do with the sea. This was in the field of the Maritime Commission. The defendant only "put to sea" because of the needs of Hawaii and Alaska—to enable these territories to receive the goods needed to carry on during the stress of the great emergency and only to the extent of protecting cargoes en route either way not insurable by the Maritime Commission. Ships were otherwise covered.

Judgment for defendant.

### Appendix.

### Title 15 U.S.C.A. § 606b—2.

"(a) The Reconstruction Finance Corporation is hereby directed to continue to supply funds to the War Damage Corporation, a corporation created pursuant to sections 606b and 609j of this title; and the amount of notes, bonds, debentures, and other such obligations which the Reconstruction Finance Corporation is authorized to issue and to have outstanding at any one time under existing law is hereby increased by an amount sufficient to carry out the provisions of this subsection. Such funds shall be supplied only upon the request of the Secretary of Commerce, with the approval of the President, and the aggregate amount of the funds so supplied shall not exceed $1,000,000,000. The Reconstruction Finance Corporation is authorized to and shall empower the War Damage Corporation to use its funds to provide, through insurance, reinsurance, or otherwise, reasonable protection against loss of or damage to property, real and personal, which may result from enemy attack (including any action taken by the military, naval, or air forces of the United States in resisting enemy attack), with such general exceptions as the War Damage Corporation, with the approval of the Secretary of Commerce, may deem advisable. Such protection shall be made available through the War Damage Corporation on and after a date to be determined and published by the Secretary of Commerce which shall not be later than July 1, 1942, upon the payment of such premium or other charge, and subject to such terms and conditions, as the War Damage Corporation, with the approval of the Secretary of Commerce, may establish, but, in view of the national interest involved, the War Damage Corporation shall from time to time establish uniform rates for each type of property with respect to which such protection is made available, and, in order to establish a basis for such rates, such Corporation shall estimate the average risk of loss on all property of such type in the United States. Such protection shall be applicable only (1) to such property situated in the United States (including the several States and the District of Columbia), the Philippine Islands, the Canal Zone, the Territories, and possessions of the United States, and in such other places as may be determined by the President to be under the dominion and control of the United States, (2) to such property in transit between any points located in any of the foregoing, and (3) to all bridges between the United States and Canada and between the United States and Mexico: Provided, That such protection shall not be applicable after the date determined by the Secretary of Commerce under this subsection to property in transit upon which the United States Maritime Commission is authorized to provide marine war-risk insurance. The War Damage Corporation, with the approval of the Secretary of Commerce, may suspend, restrict, or otherwise limit such protection in any area to the extent that it may determine to be necessary or advisable in consideration of the loss of control over such area by the United States making it impossible or impracticable to provide such protection in such area.

"(b) Subject to the authorizations and limitations prescribed in subsection (a), any loss or damage to any such property sustained subsequent to December 6, 1941, and prior to the date determined by the Secretary of Commerce under subsection (a), may be compensated by the War Damage Corporation without requiring a contract of insurance or the payment of premium or other charge, and such loss or damage may be adjusted as if a policy covering such property was in fact in force at the time of

such loss or damage. Jan. 22, 1932, c. 8, § 5g, as added Mar. 27, 1942, c. 198, § 2, 56 Stat. 175."