**MATSON NAVIGATION COMPANY, a corporation (1), and Union Oil Company of California, a corporation (2),**

v.

**The UNITED STATES.**

**Cong. No. 7-54.**

United States Court of Claims.

June 5, 1956.

Gregory A. Harrison, San Francisco, Cal., for plaintiffs. Donald D. Connors, Jr., and Brobeck, Phleger & Harrison, San Francisco, Cal., were on the briefs.

J. Frank Staley, Washington, D. C., with whom was George S. Leonard, Acting Asst. Atty. Gen., for defendant.

LARAMORE, Judge.

This is a congressional reference case by which the plaintiffs, Matson Navigation Company (hereinafter referred to as Matson) and Union Oil Company of California (hereinafter referred to as Union), seek to recover from the defendant for the loss of their two vessels, the Lahaina and the Montebello, which were sunk by Japanese submarines shortly after the Pearl Harbor attack.[1]

1. House Resolution 546, 83d Congress, 2d Session, dated June 8, 1954, referring this claim, reads as follows:

"*Resolved*, That the bill (H.R.1950) entitled 'A bill for the relief of the Union Oil Company of California and the Matson Navigation Company,' together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provi-

The facts relating to the Matson claim are as follows. On November 26, 1941, the U. S. Maritime Commission notified Matson that the Commission required the Lahaina, due in San Francisco in December, for a voyage from the Pacific Coast to Vladivostok, U. S. S. R. The Lahaina was to sail on December 18, 1941. Matson instructed that the vessel be dispatched by December 4, 1941, or earlier.

On December 4, 1941, the Lahaina, carrying a miscellaneous cargo, left the Port of Ahukini, Kauai, Territory of Hawaii, bound for San Francisco, Calif. On December 7, 1941, a radio message from the Fourteenth Naval District of the U. S. Navy was received ordering the Lahaina to the nearest friendly or United States port. Upon receipt of this message the vessel reversed its course and proceeded back toward the Territory of Hawaii, the nearest friendly port.

On December 8, 1941, the master of the Lahaina received a message from the commandant of the Twelfth Naval District, U. S. Navy, commanding the master to proceed toward Point Concepcion, Calif. The master reversed his vessel's course and proceeded toward Point Concepcion.

On December 11, 1941, the Lahaina, when about 700 miles east of Hawaii at latitude 27° 35′ North and longitude 147°25′ West, encountered a Japanese submarine which shelled and sunk her. The Lahaina was insured in favor of Matson against ordinary marine risks in the amount of $800,000 but had no war-risk insurance.

Matson applied to the U. S. Maritime Commission on December 8, 1941, for war-risk hull insurance on the Lahaina and other ships of its fleet. This was the first such application received by the Commission after December 7, 1941. The Commission did not issue such insur-ance at that time because it had not made a finding that commercial war-risk insurance for privately owned American-flag vessels was not available on reasonable terms and conditions. However, on December 8, 1941, the director of the Division of Insurance of the Commission pointed out that Matson was seeking insurance from the Commission and recommended that a finding be made that commercial insurance was not available on reasonable terms and conditions. On December 11, 1941, the Commission approved the recommendation. Matson was, as a consequence, provided insurance as of December 20, 1941, and public announcement of the action of the Commission in authorizing insurance on privately owned American-flag vessels was made on December 30, 1941.

The evidence shows that Matson, on December 8, 1941, sent a telegram to the American Marine Insurance Syndicate in New York City requesting a quotation of rates for 10 unnamed vessels en route to or from San Francisco and the Hawaiian Islands. There is no reply to this inquiry in evidence. Also, on December 8, 1941, the U. S. Maritime Commission contacted the American Marine Hull Insurance Syndicate by telephone regarding the availability of war-risk insurance and was advised that there was no suspension of insurance but that the quoting of rates for voyages in the Pacific was subject to the decision of the committee which was to meet at 2:30 that afternoon. The evidence fails to show whether the committee met and the results of the meeting, if there was one. By a 3-way telephone conversation the same day the syndicate agent advised that "rates had been quoted for all risks offered and that he had heard nothing from Matson but was ready to bind its vessels at rates to be fixed by the committee." On December 12, 1941, another request for a quotation of hull war-

sions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and char-

acter of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably, due from the United States to the claimant."

risk rates was made by Matson and the Lahaina was mentioned. The evidence in reply to this inquiry is that no quotation was then available but that London, on December 15, 1941, quoted a 2-percent rate. Matson did thereafter procure war-risk insurance on 12 of its vessels from the syndicate and canceled it effective December 20, 1941, the date the U. S. Maritime Commission insurance attached.

Matson filed a claim on December 29, 1944, with the War Damage Corporation for the loss of the Lahaina. This claim was denied on January 19, 1945, on the ground that vessels were not properly in transit within the meaning of section 5g of the Reconstruction Finance Corporation Act, as amended, 56 Stat. 174, and that vessels such as Matson's were excluded from the protection under that act. Suit was filed against the War Damage Corporation in the District Court on March 22, 1945, for the stipulated fair cash value of the vessel, $615,-000. The District Court concluded, after a review of the history of the act, that it was intended to protect only "cargoes in transit which were not insurable by the Maritime Commission and insurable otherwise only through private sources at prohibitive costs. * * * Ships were otherwise covered." Matson Nav. Co. v. War Damage Corporation, D.C., 74 F.Supp. 705, 709–710. The Court of Appeals affirmed the decision, 9 Cir., 172 F.2d 942, and the Supreme Court denied certiorari, 337 U.S. 939, 69 S.Ct. 1515, 93 L.Ed. 1744.

The facts relating to the Union claim are as follows. The Montebello, a tanker, arrived in Port San Luis, Calif., on December 20, 1941. On that date two American vessels came under enemy attack off the coast of California. These were the first such attacks in the Pacific coastal waters. Union was aware of these attacks. Port San Luis was an open port or roadstead and the vessel was just as subject to attack there as it would be in the open sea. Union discussed the danger with the local Navy routing office and it was agreed that if the vessel sailed, it should follow a course as close to the coast as could be done with safety. It was not necessary to obtain permission from the Navy to sail. The Montebello, loaded with oil, was cleared through customs for a voyage to its subsidiary in Canada with no intermediate stops. She was painted a wartime color, blacked out, and radio silence was maintained. She sailed about 1:00 a. m. on December 23, 1941, and at about 5:00 a. m. was torpedoed and sunk by enemy action between 3 and 5½ miles from the shoreline of the coast of California but over the continental shelf.

Union, both before and after Pearl Harbor, maintained marine war-risk insurance on vessels engaged in foreign trade other than Pacific coastwise trade. Late on Monday, December 22, 1941, Union sought to secure commercial war-risk insurance on seven of its vessels including the Montebello. The insurance was promptly provided but did not become effective until 1:00 p. m. on December 23, and since the Montebello was sunk that morning it was excluded from coverage. There is no evidence to show that Union could not have secured commercial war-risk insurance on the Montebello at an earlier date had it sought to do so. The vessel was covered for one and one-half million dollars by commercial war-risk insurance as well as marine insurance coverage on a trip to Vladivostok in the fall of 1941. Union had not sought war-risk insurance from the Maritime Commission before the sinking of the Montebello.

Union presented a claim to the War Insurance Corporation (name was later changed to War Damage Corporation) on January 15, 1942, in the amount of $1,001,031 for the destruction of the Montebello and her cargo. The claim was denied and suit was brought in the District Court on September 10, 1946. It was stipulated by the parties in the suit in the District Court that the fair value of the Montebello, its cargo and stores, was $1,001,431.72. The sole issue presented to the jury was whether the Montebello was within 3 miles of the

shoreline of the United States when it was sunk. The jury found that it was not, and the court in an unpublished decision entered judgment for the defendant. Union did not appeal.

The first question presented is whether the plaintiffs have a legal claim against the United States based on section 5g of the Reconstruction Finance Corporation Act, supra. The pertinent part of that section is set forth below.[2] The plaintiffs contend that their vessels were personal property within the meaning of section 5g, supra, and therefore they were covered by the free insurance from December 6, 1941, to July 1, 1942. Matson contends that the Lahaina was "property in transit" and Union contends that the Montebello was "property situated in the United States" within the meaning of section 5g, supra.

■ We agree with the decisions of the District Court and the Court of Appeals in Matson Nav. Co. v. War Damage Corporation, supra, that the property-in-transit clause was limited to cargo and was not intended to cover vessels. The Maritime Commission was already authorized by the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1128 et seq., to provide war-risk insurance if such insurance was not available on reasonable terms and conditions from commercial insurance companies. The legislative history, which was detailed by the District Court, clearly indicates that section 5g, supra, was not intended to include merchant vessels. Accordingly, we find, irrespective of the valid defenses of the statute of limitations and res judicata, that neither the Matson Navigation Company nor the Union Oil Company of California have a legal claim against the United States for the loss of their vessels the Lahaina and the Montebello.

The remaining legal question is whether the Montebello was, for purposes of

2. "Sec. 5g. (a) * * * The Reconstruction Finance Corporation is authorized to and shall empower the War Damage Corporation to use its funds to provide, through insurance, reinsurance, or otherwise, reasonable protection against loss of or damage to property, real and personal, which may result from enemy attack (including any action taken by the military, naval, or air forces of the United States in resisting enemy attack), with such general exceptions as the War Damage Corporation, with the approval of the Secretary of Commerce, may deem advisable. Such protection shall be made available through the War Damage Corporation on and after a date to be determined and published by the Secretary of Commerce which shall not be later than July 1, 1942, upon the payment of such premium or other charge, and subject to such terms and conditions, as the War Damage Corporation, with the approval of the Secretary of Commerce, may establish, . * * *. Such protection shall be applicable only (1) to such property situated in the United States (including the several States and the District of Columbia), the Philippine Islands, the Canal Zone, the Territories and possessions of the United States, and in such other places as may be determined by the President to be under the dominion and control of the United States, (2) to such property in transit between any points located in any of the foregoing, and (3) to all bridges between the United States and Canada and between the United States and Mexico: *Provided*, That such protection shall not be applicable after the date determined by the Secretary of Commerce under this subsection to property in transit upon which the United States Maritime Commission is authorized to provide marine war-risk insurance. The War Damage Corporation, with the approval of the Secretary of Commerce, may suspend, restrict, or otherwise limit such protection in any area to the extent that it may determine to be necessary or advisable in consideration of the loss of control over such area by the United States making it impossible or impracticable to provide such protection in such area.

"(b) Subject to the authorizations and limitations prescribed in subsection (a), any loss or damage to any such property sustained subsequent to December 6, 1941, and prior to the date determined by the Secretary of Commerce under subsection (a), may be compensated by the War Damage Corporation without requiring a contract of insurance or the payment of premium or other charge, and such loss or damage may be adjusted as if a policy covering such property was in fact in force at the time of such loss or damage."

determining whether its cargo was covered by the free insurance, "situated in the United States" or in a place "determined by the President to be under the dominion and control of the United States," when sunk. The jury found that the Montebello was sunk beyond the 3-mile limit and Union's suit was dismissed by the District Court. It is conceded that the Montebello was over the continental shelf when sunk.

Union contends that the Presidential Proclamation 2667, Sept. 28, 1945, 59 Stat. 884, entitled "Policy of the United States with respect to the Natural Resources of the Subsoil and Sea Bed of the Continental Shelf", established that the Montebello was sunk in the United States or in a place determined by the President to be under the dominion and control of the United States.[3]

■ Union's contention is not well founded. Vessels on the high seas are not within the United States and while on the high seas are not in a place under the dominion and control of the United States. The Presidential Proclamation specifically stated: "The character as high seas of the waters above the continental shelf and the right to their free and unimpeded navigation are in no way thus affected." Further, the Presidential Proclamation was after the Montebello was sunk, and the terms of the Proclamation indicate it was prospective only. Also, the Proclamation was before the trial of the case in the District Court, and since Union could have raised that question there it is *res judicata*. Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195.

■ We turn now to the question of whether the plaintiffs have an equitable claim against the United States. The plaintiffs contend that they have an equitable claim; i. e., equitable in the broad moral sense as defined in Gay Streit Corporation of Baltimore v. United States, 127 F.Supp. 585, 130 Ct.Cl. 341. The plaintiffs state that to select this single class of property for exclusion from the free war-risk protection is patently unfair, especially when the need for, and the public service of, merchant vessels during this period shortly after Pearl Harbor is considered. Merchant vessels were excluded from the protection of the so-called War Damage Act because the Maritime Commission was authorized to insure when it found commercial insurance could not be obtained on reasonable terms and conditions. Commercial war-risk insurance was available to both plaintiffs. It is true that the Maritime Commission found that adequate insurance on reasonable terms and conditions was not available. However, during this brief period from December 7, 1941, to December 31, 1941, when Maritime insurance was not available and when commercial insurance was available, we feel that the plaintiffs should have obtained commercial insurance even though terms and conditions were not too desirable, knowing that either the terms and conditions were reasonable or that the Maritime Commission would, in a matter of weeks, find that they were unreasonable and provide insurance on reasonable terms and conditions. The refusal of plaintiffs to obtain commercial insurance on the Lahaina and the Montebello resulted in

3. " * * * Now, Therefore, I, Harry S. Truman, President of the United States of America, do hereby proclaim the following policy of the United States of America with respect to the natural resources of the subsoil and sea bed of the continental shelf.

"Having concern for the urgency of conserving and prudently utilizing its natural resources, the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control. In cases where the continental shelf extends to the shores of another State, or is shared with an adjacent State, the boundary shall be determined by the United States and the State concerned in accordance with equitable principles. The character as high seas of the waters above the continental shelf and the right to their free and unimpeded navigation are in no way thus affected. * * * "

plaintiffs being their own insurers. We see no reason to shift this loss to the United States. Commercial war-risk insurance was obtained by Matson on its other vessels and canceled when Maritime insurance became available. War inevitably produces hardships, suffering, and losses. Allocation and priority orders were issued that had devastating effects on many businesses. Many wartime regulations were imposed that resulted in unfair treatment. Many persons were called upon to make sacrifices during this period. We find no more moral obligation on the part of the United States to reimburse these plaintiffs for their losses, which could have been prevented, than we do for the persons referred to above.

The actions of the Navy with respect to the Lahaina do not give rise to any moral responsibility on the part of the United States. The Lahaina would still have been hundreds of miles off shore even if she had received no orders from the Navy. Whether she would have been sunk is questionable.

The time of sailing and the course of the Montebello were under the complete control and discretion of Union. Why the Montebello did not wait one day before sailing to see if she had insurance is not explained.

The fact that the plaintiffs paid money to the War Damage Corporation as premiums on policies of insurance issued for the protection of other properties does not give rise to any moral obligation on the part of the United States. The plaintiffs received the protection for their properties during the life of the policies.

Plaintiffs do not have a legal or equitable claim against the United States for the loss of the Lahaina and the Montebello and cargo.

If Congress should choose to grant relief to the Matson Navigation Company for the loss of the Lahaina or the Union Oil Company of California for the loss of the Montebello and her cargo, it would be a gratuity.

This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to House Resolution 546, 83d Congress, 2d session.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.