Laramore, Judge,
delivered the opinion of the court:
This is a congressional reference case by which plaintiff, Electric Ferries, Inc., seeks to recover from the defendant for the loss of its two vessels, viz., the tugboat Menominee and the barge Ontario, which were sunk by enemy submarine gunfire on March 31, 1942.[1]
The facts relating to the claim are as follows: The Menominee was an oceangoing tug of 441 gross tons. The Ontario was a wooden barge of 1,100-ton maximum carrying capacity, owned on March 31, 1942, by the Southern Transportation Company.
On March 30, 1942, the Menominee, having in tow the Ontario and two other barges loaded with coal, left Norfolk, Va., for New York, N. Y. The United States Coast Guard gave permission to the Menominee to make the voyage and issued a clearance for the proposed route. The coal towed by the Menominee was consigned to power companies on *402 Long Island Sound, and the voyage was made in furtherance of the war effort.
At about 2:30 a. m. on March 31, 1942, when they were about six and one-half miles off the Delmarva Peninsula, Virginia, the Menominee and the Ontario were attacked by shellfire from a German submarine, and as a result the Menominee was sunk and the Ontario rendered a total loss.
At the time of their loss, the fair market value of the Menominee was $130,000, and of the Ontario $9,000.
On March 31,1942, the Menominee was protected by war-risk insurance with a private underwriter in the amount of $50,000. Said sum was paid by the underwriter to Southern Transportation Company. The Ontario was not protected by any war risk insurance.
Pursuant to resolutions adopted at a meeting on December 30, 1941, the IT. S. Maritime Commission announced on January 1, 1942, that machinery to obtain war risk insurance had been set up and was “open to ship owners unable to obtain adequate insurance for their vessels at ‘reasonable terms and conditions’ from commercial underwriters.” Pursuant to action of the IT. S. Maritime Commission on January 29, 1942, the Commission announced on February 2, 1942, the adoption of a “plan for stabilization of war risk insurance rates on merchant vessels.” This plan provided in part as follows:
Under the announced plan, a schedule of war-risk rates will be published as of the 25th of each month by commercial underwriters, applying to all vessels sailing from United States ports in a regular trade during the following month. _ These rates will be submitted to the Maritime Commission in advance of publication and will be subject to approval by the Commission.
When the rates are not approved by the Commission, shipowners will be able to obtain insurance directly from the Commission in accordance with legislation passed in June, 1940, amending the Merchant Marine Act of 1936 and authorizing the Commission to write war-risk insurance whenever in the opinion of the Commission such insurance “cannot be obtained on reasonable terms and conditions.” A fund of $40,000,000 has been set up for this purpose.
*403 * * * Where one or more rates in the schedule are declared unreasonable by the United States Maritime Commission, operators may avail themselves of the rates named by the Maritime Commission on the voyages involved and of the balance of the schedule named by the underwriters.
On February 10, 1942, the American Marine Insurance Syndicate announced its rates for war risk insurance. The U. S. Maritime Commission disapproved of certain of these rates and accordingly announced its own lower rates on account thereof. The American Marine Insurance Syndicate rate for a voyage between Norfolk, Va., and New York, N. Y., was not disapproved and the U. S. Maritime Commission issued no new rate for such a voyage.
Prior to March 31, 1942, the U. S. Maritime Commission made no determination that marine war risk insurance could not be obtained from commercial underwriters for a voyage from Norfolk, Va., to New York, N. Y., on reasonable terms and conditions.
No policy of war risk insurance was ever issued by the U. S. Maritime Commission effective on March 31,1942, for a voyage from Norfolk, Va., to New York, N. Y., or indeed for any Atlantic coastwise voyage for vessels of the type of plaintiff’s.
Prior to March 31, 1942, U. S. Maritime Commission war risk insurance was only issued to vessels in possession of United States Ship Warrants.
The Menominee, being of less than 1,000 tons and not being a tug which serviced other vessels, was unable to procure a United States Ship Warrant.
The U. S. Maritime Commission war risk insurance was not in fact available on behalf of the Menominee or the Ontario on March 31, 1942.
At the time of their loss, the Menominee and Ontario were owned by Southern Transportation Company, a Delaware corporation. As a result of the dissolution and liquidation of that corporation the within claim passed to Electric Ferries, Inc., which was the owner of 94.42 percent of the outstanding stock of Southern Transportation Company, and Electric Ferries, Inc., issued certificates of beneficial interest in the assets of Southern Transportation Company, includ *404 ing this claim, to the minority stockholders of Southern Transportation Company. Thereafter the ferry franchise of Electric Ferries, Inc., expired, and the corporation was dissolved and its assets liquidated. Pursuant to the liquidation the within claim passed to Brooklyn and Richmond Ferry Company, Inc., a wholly owned subsidiary of Electric Ferries, Inc., and the stock of Brooklyn and Richmond Ferry Company, Inc., was distributed to the stockholders of Electric Ferries, Inc., in the same proportions as these stockholders had held the stock of Electric Ferries, Inc. Accordingly, the beneficial ownership of the claim was never changed by virtue of either of said dissolutions or liquidations.
Plaintiff contends (1) that under the Reconstruction Finance Corporation Act, as amended, infra, the Reconstruction Finance Corporation was authorized to write insurance on vessels when two conditions obtained: First, if insurance were not available on reasonable terms and conditions from private underwriters, and second if such insurance was not available from the Maritime Commission; (2) plaintiff is equitably entitled to recover because the legislative intention was that between the Reconstruction Finance Corporation and the Maritime Commission, the entire spectrum of possible losses would be covered, either by means of Government insurance or reasonably priced commercial insurance; and (3) the within claim was not assigned in contravention of law.
The first question presented is whether the plaintiff has a legal claim against the United States based on section 5 (g) of the Reconstruction Finance Corporation Act, 47 Stat. 5, as amended, 56 Stat. 174, 175.[2]
*405 This presents the same problems as were presented and considered by this court in the congressional reference of the case of Matson Navigation Company and Union Oil Company of California v. United States, 135 C. Cls. 526, wherein the court filed an opinion adverse to the plaintiffs. This court in the above case followed the decision of the District Court[3] and the Court of Appeals[4] in the case of Matson Navigation Company v. War Damage Corp., wherein this court stated:
We agree with the decisions of the District Court and the Court of Appeals in Matson Nav. Co. v. War Damage Corporation, supra, that the property-in-transit clause was limited to cargo and was not intended to cover vessels. The Maritime Commission was already authorized by the Merchant Marine Act of 1936, as amended, 46 U. S. C. § 1128 et seq., to provide war risk insurance if such insurance was not available on reasonable terms and conditions from commercial insurance companies. The legislative history, which was detailed by the District Court, clearly indicates that section 5 (g), supra, was not intended to include merchant vessels. Accordingly, we find, irrespective of the valid defenses of the statute of limitations and res judicata, that neither the Matson Navigation Company nor the Union Oil Company of California have a legal claim against the *406 United States for the loss of tbeir vessels the Lahaina and the Montebello.
The District Court’s opinion in Matson Navigation Company v. War Damage Corp., supra, reviewed the legislative history of the Eeconstruction Finance Corporation Act, supra, and concluded as follows:
The entire history of the legislation, viewed in the background of its origin and objectives, convincingly exhibits a general Congressional intent to extend reasonable free government protection against loss from enemy attack, to property in the United States, its territories and possessions, and to goods undergoing transportation between these points — until a system of paid insurance contemplated thereby had been put in operation; and to thereafter extend similar protection under contract of insurance with premium payment, except as to goods in transit insurable by the United States Maritime Commission. Coverage at any time by the War Damage Corporation, of the vehicle of maritime transportation— the vessel itself — was never within the contemplation of Congress.
The Court of Appeals in affirming the above case (172 F. 2d 942) used the following language:
The “in transit” clause is not so free from ambiguity as to preclude resort to the legislative history. The opinion of the trial court, 74 F. Supp. 705, exhaustively reviews the background and history of the statute and it would be idle for us again to plow that field. It is clear from the committee hearings that, except for a limited period in respect of cargo, Congress had no intention of authorizing the War Damage Corporation to cover what the Maritime Commission already had authority to insure. The concession in respect of property in transit was made in response to the pleas of the delegates from Hawaii and Alaska, whose sole concern, as expressed before the Senate committee, was for coverage for goods in transit to and from their ports; and even this concession appears to have been made, in part at any rate, under a misapprehension. From the inception of the legislation to. the final enactment of the statute protection for ships appears to have formed no part of this particular program. The evidence to this effect is simply overwhelming.
*407 We now adhere to our former ruling that section 5 (g) of the Keconstruction Finance Corporation Act, supra, was not intended to include vessels and plaintiff does not have a legal claim against the United States for the loss of the vessels Menominee and Ontario.
The remaining question is whether plaintiff is equitably entitled to recover.
Plaintiff urges in its brief, citing Burkhardt v. United States, 113 C. Cls. 658, 667 that
* * * the term “equitable claim” as used in 28 U. S. C. Sec. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations.
Plaintiff seems to base this moral equitable claim on the ground that if the Menominee was not within coverage of the Keconstruction Finance Corporation Act, supra,, it was then within an unintended gap in coverage from private sources at reasonable rates.
The Maritime Commission had adopted regulations under which marine war risk insurance was only issued to vessels possessing United States Ship Warrants.[5]
Thus it can be seen that the Menommee was not eligible to receive such a warrant. However, commercial war risk insurance was available to plaintiff, proof of which is the *408 fact that plaintiff actually did procure $50,000 worth of insurance on the Menominee and was paid therefor.
The commercial rates may have been excessive but that determination was for the Maritime Commission, and a finding that the commercial rates were excessive was necessary before determination of eligibility. No such finding was made by the Maritime Commission and hence plaintiff’s eligibility for Maritime insurance was never determined. However, as we said in the Matson case, supra:
* * * we feel that the plaintiffs should have obtained commercial insurance even though terms and conditions were not too desirable, * * *. War inevitably produces hardships, suffering, and losses. Allocation and priority orders were issued that had devastating effects on many businesses. Many wartime regulations were imposed that resulted in unfair treatment. Many persons were called upon to make sacrifices during this period.
Many persons sacrificed their lives in the furtherance of the war effort as a patriotic duty to whom no compensation could be made. Here plaintiff was engaged in a commercial enterprise with the idea of making a profit. Plaintiff could have insured its vessels for the full value through commercial channels and notwithstanding the fact that insurance rates were high, could have prevented the losses here in suit. We find no more moral obligation on the part of the United States to reimburse plaintiff for its losses, which could have been prevented, than we do for the persons referred to above.
Inasmuch as plaintiff has no claim either legal or equitable against the United States, it is not necessary to decide whether or not the claim was assigned in contravention of law.
CONCLUSION
Plaintiff does not have a legal or equitable claim against the United States for the loss of the Menominee and the Ontario.
If Congress should choose to grant relief to the plaintiff, Electric Ferries, Inc., for the loss of said vessels, it would be a gratuity.
*409 This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to House resolution 545, 83d Congress, 2d session.
MaddeN, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINQS 03? 3TACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. This claim was referred to the United States Court of Claims pursuant to House Eesolution No. 545, on June 8, 1954, pursuant to Title 28, United States Code, sections 1492 and 2509, which resolution provides as follows:
Resolved, That the bill (H. It. 5587) entitled “A bill for the relief of Electric Ferries, Incorporated, of New York, as agent and trustee of the stockholders of Southern Transportation Company of New York”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
2. H. R. 5587 referred to in House Resolution No. 545, set out in finding 1, provides as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That out of the sums (of $210,751,618.65) representing profits of the War Damage Corporation, which were required to be covered into the Treasury of the United States pursuant to Public Law 268, Eightieth Congress (61 Stat. 579), the Secretary of the Treasury be and he is hereby, authorized and directed to pay to Electric Ferries, Incorporated, as agent and trustee of the stockholders of Southern Transportation Company, $89,000.
*410 The payment of the sum of $89,000 shall be in full settlement of all property claims against the United States on account of the loss of the tug Menominee and the barge Ontario as a result of attack by a German submarine on March 31, 1942: Provided, That no part of the amounts appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
3. On March 31,1942, Southern Transportation Company, a Delaware corporation, was the owner of the tug Menominee and of the barge Ontario.
4. The Menominee was an all steel 1,000-horsepower, coal-burning steam tug, with a single screw triple expansion engine, built in 1919, of 441 gross tons, 118 net tons, 141.45 feet long, with a beam of 27.7 feet and a depth of 16 feet.
5. The Ontario was a wooden barge of 1,100-ton maximum carrying capacity, built in 1916, 196 feet long on the keel, 208 feet overall, 23 feet 10 inches in breadth, 16 feet 6 inches in height at the bow, 17 feet 6 inches at the stern, and 13 feet amidship. She had two winching engines, one forward and one aft.
6. On March 30, 1942, the Menominee having in tow the Ontario, and also 2 barges loaded with coal, left Norfolk, Ya., for New York, N. Y.
7. The United States Coast Guard gave permission to the Memominee to make the voyage and issued a clearance for the pi'oposed route.
8. The coal towed by the Menominee was consigned to power companies on Long Island Sound. The Menominee's voyage was made in the usual service of Southern Transportation Company, in furtherance of the war effort, and pursuant to directives of the Office of Defense Mobilization.
9. At about 2:30 a. m. on March 31,1942, when they were about six and a half miles off the Delmarva Peninsula, Virginia, the Menominee and Ontario were attacked by shellfire *411 from a submarine of the Government of Germany, known as the Third Reich. As a result of said shellfire, the Menominee was sunk and the Ontario rendered a total loss.
10. The plaintiff contends that, if entitled to recover, it should recover the fair market value of the Menominee and the Ontario at the time of their loss on March 31, 1942.
On September 11, 1942, plaintiff’s predecessor, Southern Transportation Company, sold to the Pennsylvania Railroad Company the tug Battleboro for the sum of $130,000. The Battleboro was a sister ship to the Menominee, similar in all respects, except that the Menominee had a little deeper keel, which made her more seaworthy. In May 1942 Southern Transportation Company chartered to the War Shipping Administration another sister tug to the Menominee, the Keshena, on bareboat basis. Said charter contained an agreement as to value in case of loss, in the sum of $130,000, which sum was later paid by the War Shipping Administration upon the loss of such tug.
The fair market value of the Menominee on March 31, 1942, was $130,000.
11. Several barges comparable to the Ontario, but varying in size and capacity, were sold by Southern Transportation Company at or near the time of its loss on March 31, 1942. In comparison with said sales, the fair value of the Onta/rio on such date was $9,000.
12. It is defendant’s contention that, in the event of recovery, such recovery should be limited to the depreciated value of the Menomonee and the Ontario, as shown on the books of Southern Transportation Company as of the date of their loss. On March 31, 1942, the book value of the Menominee was $25,287.55; the book value of its radio direction finder was $57.26, and of its radio telephone $264.09. On such date the book value of the Ontario was $5,859.09.
13. On March 31, 1942, the Menominee was protected by war risk insurance with a private underwriter in the amount of $50,000, and said sum was received from the underwriter by Southern Transportation Company. No other sums have been received from any other person or party, including any government or governmental agency, as a result of or on account of the loss of the Menominee.
*412 14. On March 31,1942, the Ontario was not protected by any war risk insurance. No sums have been received from any person or party, including any government or any governmental agency, as a result of or on account of the loss of the Ontario.
15. At the time of their loss the cost of marine war risk insurance on the Menominee and Ontario for a voyage from Norfolk, Va., to New York, N. Y., was $2.25 per $100 insurance for each single trip or 30-day period, whichever was longer.
16. The cost of marine war risk insurance in the early months of World War II was an important factor in the operating costs of merchant vessels.
17. The Menominee and the Ontario were the first vessels lost by Southern Transportation Company, and were the first tugs and equipment lost on account of war risk on the Atlantic Coast in World War II.
18. Pursuant to resolutions adopted at a meeting on December 30, 1941, the U. S. Maritime Commission announced on January 1, 1942, that machinery to obtain war risk insurance had been set up and was “open to ship owners unable to obtain adequate insurance for their vessels at ‘reasonable terms and conditions’ from commercial underwriters.” Pursuant to action of the U. S. Maritime Commission on January 29, 1942, the Commission announced on February 2, 1942, the adoption of a “plan for stabilization of war risk insurance rates on merchant vessels.” This plan provided in part as follows:
Under the announced plan, a schedule of war-risk rates will be published as of the 25th of each month by commercial underwriters, applying to all vessels sailing from United States ports in a regular trade during the following month. These rates will be submitted to the Maritime Commission in advance of publication and will be subject to approval by the Commission.
When the rates are not approved by the Commission, shipowners will be able to obtain insurance directly from the Commission in accordance with legislation passed in June, 1940, amending the Merchant Marine Act of 1936 and authorizing the Commission to write war-risk insurance whenever in the opinion of the Commission such insurance “cannot be obtained on reasonable terms *413 and conditions.” A fund of $40,000,000 has been set up for this purpose.
* * * Where one or more rates in the schedule are declared unreasonable by the United States Maritime Commission, operators may avail themselves of the rates named by the Maritime Commission on the voyages involved and of the balance of the schedule named by the underwriters.
19. On February 10,1942, the American Marine Insurance Syndicate announced its rates for war risk insurance. The U. S. Maritime Commission disapproved of certain of these rates and accordingly announced its own lower rates on account thereof. The American Marine Insurance Syndicate rate for a voyage between Norfolk, Ya., and New York, N. Y., was not disapproved and the U. S. Maritime Commission issued no new rate for such a voyage.
20. Prior to March 31, 1942, the U. S. Maritime Commission made no determination that marine war risk insurance could not be obtained from commercial underwriters for a voyage from Norfolk, Ya., to New York, N. Y., on reasonable terms and conditions.
21. No policy of war risk insurance was ever issued by the U. S. Maritime Commission effective on March 31,1942, for a voyage from Norfolk, Ya., to New York, N. Y., or indeed for any Atlantic coastwise voyage for vessels of the type of plaintiff’s.
22. Prior to March 31, 1942, U. S. Maritime Commission war risk insurance was only issued to vessels in possession of United States Ship Warrants.
23. The Menominee, being of less than 1,000 tons and not being a tug which serviced other vessels, was unable to procure a United States Ship Warrant.
24. The U. S. Maritime Commission war risk insurance was not in fact available on behalf of the Menominee or the Ontario on March 31,1942.
25. Southern Transportation Company was dissolved pursuant to resolutions duly adopted by its board of directors on December 18, 1947, and its stockholders on January 27, 1948. The duly adopted plan of liquidation provided that *414 all the assets of tbe corporation should be distributed within the three calendar years following the year 1947.
26. On November 20, 1950, Electric Ferries, Inc., was the owner of 94.42 percent of the issued and outstanding stock of Southern Transportation Company.
27. On November 20, 1950, pursuant to resolutions duly adopted by the board of directors of Southern Transportation Company on November 20,1950, and resolutions duly adopted by the board of directors of Electric Ferries, Inc., on October 27, 1950, an agreement was entered into between Southern Transportation Company, acting through its trustees in dissolution, and Electric Ferries, Inc., whereby Southern Transportation Company sold and assigned all its assets, including its claims against the U. S. Government, to Electric Ferries, Inc., and Electric Ferries, Inc., assumed all the liabilities of Southern Transportation Company, and also undertook to issue to each of the minority stockholders of Southern Transportation Company a certificate of beneficial interest representing such minority stockholders’ interest in the assets of Southern Transportation Company. Such certificates of beneficial interest were issued by Electric Ferries, Inc., to the minority stockholders of Southern Transportation Company. On November 24, 1950, the Board of Directors of Electric Ferries, Inc., ratified and approved the agreement of November 20, 1950.
28. The ferry franchise granted by New York City to Electric Ferries, Inc., expired on March 31, 1954. Counsel for Electric Ferries, Inc., advised that under the provisions of the Internal Revenue Code no gain or loss would be recognized to the corporation on its sale of property in 1954, provided the corporation distributed all of its assets (less those retained to meet claims) before January 1,1955, in complete liquidation of the corporation, and otherwise complied with the requirements of said Code. Accordingly, on September 27, 1954, the stockholders of Electric Ferries, Inc., duly resolved to dissolve and liquidate the corporation before January 1, 1955. Electric Ferries, Inc., was dissolved on October 27, 1954.
29. On December 28,1954, Electric Ferries, Inc., owned all the outstanding shares of Brooklyn and Richmond Ferry *415 Company, Inc. In order to accomplish the purposes of the resolutions of September 27, 1954, pursuant to resolutions duly adopted by the board of directors of Electric Ferries, Inc., on December 21, 1954, all the right, title and interest of Electric Ferries, Inc., in and to the claims here in issue, were conveyed to Brooklyn and Kichmond Ferry Company, Inc., on December 28, 1954, and the stock of Brooklyn and Kichmond Ferry Company, Inc., was distributed to the stockholders of Electric Ferries, Inc., as a liquidating dividend.
30. As a result of the dissolution and liquidation of Southern Transportation Company, the claim of Southern Transportation Company against the United States here at issue passed to the stockholders of the company, including Electric Ferries, Inc., which owned 94.42 percent of said stock. The interest of Electric Ferries, Inc., passed to its stockholders, who became owners of Brooklyn and Kichmond Ferry Company, Inc., stock in the same ratio as they had been stockholders of Electric Fei’ries, Inc., pursuant to the dissolution and liquidation of that corporation. The beneficial ownership of the claim was never changed by virtue of either of said dissolutions and liquidations.
31. At all times material hereto, and until their dissolu-tions, Southern Transportation Company was a corporation organized under and pursuant to the laws of the State of Delaware and a citizen of the United States, and Electric Ferries, Inc., was a corporation organized under and pursuant to the laws of the State of New York and a citizen of the United States. At all times material hereto, Brooklyn and Kichmond Ferry Company, Inc., was and still is a corporation organized under and pursuant to the laws of the State of New York and a citizen of the United States.
32. From and after the date of his retainer by Electric Ferries, Inc., in September 1948, Charlton Ogburn, Esq., attorney for plaintiff, was diligent in presenting plaintiff’s claim before the War Claims Commission, the Department of State, and the War Damage Commission.
33. The sum of $210,751,618.65 was covered into the Treasury of the United States pursuant to Public Law 268, 80th Congress (61 Stat. 579), and applied to the reduction of the national debt.

 House resolution 545, 83d Congress, 2d session, dated June 8, 1954, referring this claim, reads as follows:
“Resolved, That the bill (H. R. 5587) entitled ‘A bill for the relief of Electric Ferries, Inc., of New York, as agent and trustee of the stockholders of Southern Transportation Co. of New York,’ together with all accompanying papers, is hereby referred to the united States Court of Claims pursuant to sections 1492 and 2509 of title 28, united States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the united States, and the amount, if any, legally or equitably due from the United States to the claimant.”

 Sec. 5g. (a) * * * The Reconstruction Finance Corporation is authorized to and shall empower the War Damage Corporation to use its funds to provide, through insurance, reinsurance, or otherwise, reasonable protection against loss of or damage to property, real and personal, which may result from enemy attack (including any action taken by the military, naval or air forces of the United States in resisting enemy attack), with such general exceptions as the War Damage Corporation, with the approval of the Secretary of Commerce, may deem advisable. Such protection shall be made available through the War Damage Corporation on and after a date to be determined and published by the Secretary of Commerce which shall not be later than July 1, 1942, upon the payment of such premium or other charge, and subject to such terms and conditions, as the War Damage Corporation with the approval of the Secretary of Commerce, may establish, * ♦ *. Such protection shall be applicable only *405 (1) to such property situated in the united States (including the several States and the District of Columbia), the Philippine Islands, the Canal Zone, the Territories and possessions of the united States, and in such other places as may be determined by the President to be under the dominion and control of the united States, (2) to such property in transit between any points located in any of the foregoing, and (3) to all bridges between the united States and Canada and between the united States and Mexico: Provided, That such protection shall not be applicable after the date determined by the Secretary of Commerce under this subsection to property in transit upon which the united States Maritime Commission is authorized to provide marine war-risk insurance. The War Damage Corporation, with the approval of the Secretary of Commerce, may suspend, restrict, or otherwise limit such protection in any area to the extent that it may determine to be necessary or advisable in consideration of the loss of control over such area by the united States making it impossible or impracticable to provide such protection -in such area.
(b) Subject to the authorizations and limitations prescribed in subsection (a), any loss or damage to any such property sustained subsequent to December 6, 1941, and prior to the date determined by the Secretary of Commerce under subsection (a), may be compensated by the War Damage Corporation without requiring a contract of insurance or the payment of premium or other charge, and such loss or damage may be adjusted as if a policy covering such property was in fact in force at the time of such loss or damage.

 74 F. Supp. 705, 709-710.

 172 F. 2d 942, cert. denied 337 U. S. 939.

 46 CFR, 1941 Supp., 241.31, provided In pertinent part:
Glasses of warrants. Warrants for vessels will be issued with the following classes:
.(a) Class A-l: Class A-l shall apply to vessels of 1,000 or more gross tons employed * * *.
(b) Class A-2: Class A-2 shall apply to vessels of 1,000 or more gross tons employed * * *.
(c) Class A-3: Class A-3 shall consist of vessels of less than 1,000 gross tons (other than railroad car ferries, tug boats, salvage and other vessels used in servicing vessels). Vessels in Class A-3 shall not apply for nor hold a warrant but shall instead exhibit their license papers to facilities as evidence of their classification hereunder (Sec. 3.01). *****
46 CER, 1941 Supp., 241.41, provided as follows:
Eligible vessels. Warrants (except for vessels in Class A-<3) may be issued by the Commission upon application by the owner, charterer or duly authorized managing agent, for any vessel documented under the laws of the united States, or owned by a citizen of the United States; or documented under the laws of a foreign nation and not owned by a citizen of the united States (Sec. 4.01).